

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| JENNIFER SMITH, *individually and as the Legal Guardian of D.B., a minor*, <br> Plaintiff, <br><br> vs. <br><br> CHENELLE OKORO; TYRA BRACEY; FRANK MILLER; NICOLE CARTER; JESSE BRYANT, JR., and NATALIE SUBER, <br> Defendants. | Civil Action No.: 6:22-4451-MGL |

**ORDER ADOPTING THE REPORT AND RECOMMENDATION,
DENYING DEFENDANTS BRACEY AND MILLER'S
MOTION FOR SUMMARY JUDGMENT,
AND GRANTING DEFENDANTS OKORO, CARTER, BRYANT,
AND SUBER'S MOTION FOR SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Plaintiff Jennifer Smith (Smith), individually and as the Legal Guardian of D.B. (DB), a minor, filed this civil action against Defendants Chenelle Okoro (Okoro); Tyra Bracey (Bracey), Frank Miller (Miller), Nicole Carter (Carter), Jesse Bryant, Jr. (Bryant), and Natalie Suber (Suber) (collectively, Defendants), alleging deliberate indifference under 42 U.S.C. § 1983.

This matter is before the Court for review of the Report and Recommendation (Report) of the Magistrate Judge recommending the Court deny Bracey and Miller's motion for summary judgment and grant Okoro, Carter, Bryant, and Suber's motion for summary judgment.  The Report

was made in accordance with 28 U.S.C. § 636 and Local Civil Rule 73.02 for the District of South Carolina.

II.    **FACTUAL AND PROCEDURAL HISTORY**

The South Carolina Department of Juvenile Justice's (DJJ) Midlands Evaluation Center (MEC) assumed care and custody of DB, a female juvenile, as the result of an incorrigibility adjudication. During DB's evaluation period at MEC, four male juveniles sexually assaulted her. At the time, Bracey, Miller, Carter, and Bryant were juvenile correctional officers (JCOs) at MEC.

On the day of the assault, Bracey was on duty in the control room, and Miller was supervising a male housing unit.

The control room contained monitors with live video feeds covering the gym and adjacent hallway, which has a door leading to the gym and a door leading to the Pearl Unit. As the control room officer, Bracey was responsible for monitoring the live feeds, conducting security checks, and remotely opening doors upon the request of a JCO.

Sometime before 5:15 p.m., Miller took a group of male juveniles to the gym for recreation. Video of Pearl Building at 00:00–00:05. Then, at around 5:15 p.m., JCO Ya'Kerria Tolbert (Tolbert) led a group of female juveniles down the hallway next to the gym. *Id.* at 00:00–00:52.

While Tolbert's group was in the hallway, a female juvenile in a separate group, escorted by Carter, repeatedly hit the intercom button in Pearl Unit, evidently requesting Bracey open the door connecting Pearl Unit to the hallway. Priscilla Pee's (Pee) Investigative Report at 3–4. Without visually or audibly confirming whether a JCO was requesting the door to be opened, Bracey remotely opened the door. *Id.* at 4; Video of Pearl Unit at 00:53–01:04. This resulted in the two groups crossing paths in the hallway. Video of Pearl Building at 00:50–01:00.

Almost immediately, a dispute broke out. *Id.* at 01:00–01:05. Carter and Tolbert tried to deescalate the situation, but tensions rose when Bracey, unprompted, opened the gym door, and male juveniles flooded the hallway. *Id.* at 01:06–01:57. Miller followed the male juveniles into the hallway, attempting to corral them back into the gym. *Id.* at 01:57–02:27. Shortly thereafter, Bracey called JCO Bryant for backup, and Bryant joined Miller to assist. *Id.* at 02:27–02:35; Pee's Investigative Report at 5.

At one point during the chaos, a male juvenile picked up a female juvenile by the knees and carried her into the gym, while another small group of male juveniles swept an additional female juvenile into the gym with a group of male juveniles in the midst of the chaos. Video of Pearl Unit at 02:46–03:10. After most of the male juveniles were contained in the gym with Miller, the two females returned to the hallway, and Miller stood with his back against the closed gym door. *Id.* at 03:10–03:40; Miller's Deposition at 31. Bryant, Carter, and Tolbert, however, remained in the hallway, still trying to split up the female juveniles. Video of Pearl Unit at 03:40–05:05.

Within a couple of minutes, Carter collapsed in the hallway, evidently with a medical incident. *Id.* at 05:00–05:10. Bryant was beside Carter in seconds, as female juveniles gathered around her, and male juveniles peered through the gym door to see the commotion. *Id.* at 05:10–05:51. Around this same time, Miller claims he heard yelling from behind the gym door. Miller's Deposition at 31. Miller turned around, looked through the gym door, and saw Carter laying on the ground in the hallway. *Id.* Miller asked Bracey to open the gym door, which she did, causing male juveniles to flood the hallway again. *Id.* at 31–32; Video of Pearl Unit at 06:31–07:01.

For several minutes, Bryant and Miller, later joined by JCO Cohanskie Goodson, attempted to separate the groups while other juveniles tended to Carter, who was still on the ground. *Id.* at

3

07:01–09:55. At this point, DB was standing in the hallway within arm's length of Bryant and Miller. *Id.* at 09:55–10:27. But, a taller male juvenile walked toward DB, brushed arms with Miller, pushed DB into the gym, and then into an unlocked bathroom. *Id.* at 10:27–10:43. Outside the view of the surveillance cameras, four male juveniles sexually assaulted DB. Miller's Deposition at 32–34.

In the complaint, Smith alleges the acts and omissions of Bracey, Miller, Carter, and Bryant proximately caused the sexual assault. Smith also claims Suber, a DJJ social worker assigned to MEC, denied DB adequate medical and psychological treatment after the assault. Further, Smith asserts supervisory claims against Okoro, then-Director of the MEC, as well as Carter, who was acting supervisor at the time of the assault.

Bracey and Miller filed a motion for summary judgment, as did Okoro, Carter, Bryant, and Suber. The Magistrate Judge filed the Report on January 31, 2025. Bracey and Miller filed objections on February 28, 2025, and Smith replied on March 14, 2025.

Having been fully briefed on the relevant issues, the Court will now adjudicate the motions for summary judgment.

### III.     STANDARD OF REVIEW

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The Court is charged with making a de novo determination of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

The Court, however, need not conduct a de novo review of the record "when a party makes general and conclusory objections that do not direct the court to a specific error in the [Magistrate Judge's] proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). The Court reviews the Report only for clear error in the absence of specific objections. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record to accept the recommendation'").

### IV.     DISCUSSION AND ANALYSIS

Bracey and Miller raise two objections to the Report. The Court will consider each objection in turn.

#### *A.     Whether Bracey and Miller are entitled to summary judgment*

First, Bracey and Miller contend their actions were merely accidental or negligent and fail to rise to the level of a constitutional violation.

##### *1.     Whether Bracey's actions constitute deliberate indifference*

In the Report, the Magistrate Judge determined "[a] reasonable jury could find . . . Bracey acted or failed to in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." Report at 13 (internal quotation marks omitted). In other words, the Magistrate Judge concluded a reasonable jury could find Bracey was deliberately indifferent to an excessive risk of harm to DB.

Bracey and Miller, however, assert "there is no evidence . . . Bracey had worked the control room during the day shift other than on the day of the incident; had knowledge that a single female had been placed in a gym with unsupervised males; had knowledge of an unlocked bathroom with

5

no video supervision; or that Bracey was responsible for inspecting the bathroom in the gym." Bracey & Miller's Objections at 2 (emphasis omitted). Moreover, Bracey and Miller insist "[t]he general experiences . . . Bracey had at MEC and that she was aware of the prior unrestrained conduct of the juveniles prior to opening the door at the request of . . . Miller is simply not enough to establish a Fourteenth Amendment violation." *Id.*

Smith, on the other hand, notes Bracey was trained to work in the control room, had worked there approximately fifteen times before, and was aware of her responsibility to observe video monitors to protect juveniles from sexual abuse. Nevertheless, Smith contends the video evidence demonstrates Bracey "previously witnessed two females being taken into the gym [by males] after she opened the [gym] door" and was thus "aware or should have been aware of a substantial risk that female [juveniles] could be assaulted by male juveniles." Smith's Reply at 2–3. Smith also asserts Bracey's facility inspection report from the day of the incident fails to document the gym bathroom door was unlocked, despite evidence indicating the report should have contained such documentation.

The Court agrees with the Magistrate Judge's conclusion Smith has "demonstrated inconsistencies between MEC policies and . . . Bracey's conduct the day of the incident." Report at 12.

Bracey testified she shadowed another officer in the control room more than fifteen times. Bracey's Deposition at 13, 48. Bracey admitted her responsibilities included remotely operating MEC's doors, notating the movement of all juveniles in a designated logbook, and conducting security checks. *Id.* at 18, 25. Bracey testified she regularly witnessed large altercations between juveniles, had been assaulted roughly three times by a juvenile, and had been involved in crisis

6

training on what to do in the event of an emergency. *Id.* at 23, 43. Simply put, Bracey knew MEC could be a dangerous place for juveniles. *Id.* at 23.

But, on the day of the incident, video evidence demonstrates Bracey opened the Pearl Unit door despite another group of juveniles being in the hallway, opened the gym door notwithstanding an ongoing physical altercation in the hallway, and opened the gym door again although the live feed indicated, minutes earlier, two female juveniles had been taken into the gym by male juveniles and left unsupervised. Video of Pearl Unit at 00:50–01:00, 01:06–03:10, 06:31–07:01.

MEC policy indicates Bracey, as the control room officer, was responsible for "monitor[ing] cameras, phone, the intercom system, and facility movement" and "hav[ing] working knowledge of all emergency preparedness procedures." MEC Post Order: Control Room Officer. Similarly, MEC's staffing plan states "[t]he main control room staff are responsible for observing the video monitors." MEC Staffing Plan at 6. The staffing plan further explains MEC's "closed-circuit camera system" exists "to further protect youth from sexual abuse." *Id.* And, the camera system surveils all public areas except, as is relevant here, bathrooms.

Although Bracey testified she was unaware the gym bathroom door was unlocked, she signed a daily patrol and inspection report attesting she "patrolled all . . . activity areas . . . of this facility for conditions of health, safety, good order, security, and cleanliness." Bracey's Daily Patrol and Inspection Report. And, Bryant testified officers conducting safety inspections should note if the gym bathroom door is unlocked. Bryant's Deposition at 35; *see* Okoro's Deposition at 49–50 (explaining bathroom doors should always be locked).

An investigative report by DJJ Management Review Administrator Pee also provides valuable insight to the events preceding DB's sexual assault. Pee determined Bracey improperly opened doors on three separate occasions: first, for the female juvenile pressing the Pearl Unit

7

intercom; second, for who Bracey believed, but failed to confirm was, Bryant; and third, for Miller. On this last instance in particular, Bracey opened the gym door despite her knowledge of previous disputes in the hallway and notwithstanding live video footage demonstrating ongoing physical altercations. Video of Pearl Unit at 05:00–07:01. As a result of Bracey's actions, Pee found "Bracey . . . contributed to the male youth having access to the back hallway where the female youths were." Pee's Investigative Report at 9. And, it is the presence of the male juveniles in this hallway that ultimately resulted in DB's sexual assault.

Additionally, Smith's expert, Barbara Morton (Morton), opined:

> [Bracey] should have [called] a code based on [her] observation of the fighting and [the] breach of the hallway [she] should have been viewing on camera. Staff lacked situational awareness in the major unit disturbance. Staff failed to use a radio call as the means for which door security as authorized. . . . Bracey failed to properly identify and confirm access before unlocking security doors.

Morton's Expert Report at 7 (footnote omitted); see also Morton's Deposition at 112 (testifying to the process for calling a code). And, in Morton's opinion, Bracey improperly opened the doors. *Id.* at 120–21.

Given the foregoing evidence, the Court agrees with the Magistrate Judge "a reasonable jury could find . . . Bracey 'acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Report at 13 (quoting *Gilliam v. Dep't of Pub. Safety & Corr. Servs.*, No. 23-1047, 2024 WL 5186706, at *10 (D. Md. Dec. 20, 2024)). In other words, such a jury could find Bracey was deliberately indifferent to an excessive risk of harm to DB. Therefore, the Court holds Bracey is unentitled to summary judgment on Smith's deliberate indifference claim against her.

### 2.    *Whether Miller's actions constitute deliberative indifference*

In the Report, the Magistrate Judge determined "[a] reasonable jury could find . . . Miller had other options by which he could have assisted . . . Carter without requesting the gym door be

opened." Report at 16. But, Bracey and Miller assert that evidence is absent. Bracey & Miller's Objections at 3. Bracey and Miller maintain "[t]here is no evidence . . . Miller had knowledge that: 1) . . . Bryant immediately assisted . . . Carter after she collapsed; 2) . . . Carter was breathing, conscious, and able to communicate; and 3) . . . Tolbert returned to check on . . . Carter and then left to summon a nurse." *Id.* at 3.

Smith, on the other hand, asserts the Magistrate Judge's reference to "other options" Miller could have taken reflects the Magistrate Judge's belief "Miller's intentional decision to open the door and to abandon his post could be considered an unreasonable response to the risk of assault and not the only course of action available to him." Smith's Reply at 5. Smith insists Miller's actions violated DJJ's policy and contradicted accepted juvenile correctional practices. The Court agrees with Smith.

Miller testified he knew juveniles could be violent, and the group he took to the gym had been unusually rowdy earlier in his shift. Miller's Deposition at 10, 20–21. Specifically, the juveniles had been unresponsive to Miller's directions, extremely active, and resistant to staying still. *Id.*

Miller knew male and female juveniles were kept separate as a matter of DJJ policy because intermingling created a dangerous situation. *Id.* at 16–17. And, a dangerous situation in fact occurred when Bracey initially opened the gym door. Miller witnessed this first-hand, as he and Bryant spent almost two minutes trying to corral the male juveniles back into the gym. Video of Pearl Unit at 01:57–03:40.

Nevertheless, when Miller saw Carter collapsed in the hallway, he called the control room, and Bracey opened the gym door at his request. *Id.* at 32. Miller later claimed he was unable to see any staff members assisting Carter until the gym door opened. Pee's Investigative Report at

48. Nevertheless, video footage indicates Bryant was beside Carter within two seconds of her collapse, and Tolbert was nearby, as well. Video of Pearl Unit at 05:00–05:10. And, Bracey testified the JCOs communicated via walkie-talkies, Bracey's Deposition at 18–19, which Miller could have used to call for backup in the same way Bracey initially summoned Bryant to the scene.

In light of the video footage, Pee concluded "Miller was aware of what occurred when the door opened the first time (youth being disorderly and that two female youth entered the gym) and should not have requested the door be opened for a second time." Pee's Investigative Report at 9 (emphasis omitted). Pee explained Miller "lost focus" on securing the male juveniles and "instead, . . . stood and focused on the nurse and Carter." *Id.* And, Pee concluded Miller's "lack of effort to regain control of the [male juveniles] allowed for [DB] to enter the gym[,]" *id.*, which ultimately resulted in her sexual assault.

Although Okoro, Carter, Bryant, and Suber's expert witness Charles Kehoe (Kehoe) stated he "does not believe that deliberate indifference caused [Miller's] errors in judgment[,]" Kehoe nevertheless opined Miller made "considerable errors" that led to DB's sexual assault. Kehoe's Expert Report at 13–14. And, during a subsequent deposition, Kehoe testified Miller erroneously opened the gym door to respond to Carter's medical incident. Kehoe's Deposition at 110.

Similarly, Morton opined Miller "should have called a code via the radio when the [male juveniles] first breached the hall from the gym." Miller's Report at 7. She testified the JCOs had radios, there was a nurse in the building, and another staff member was with Carter in the hallway, so Miller "leaving [his] . . . high-risk group unattended is unacceptable under any circumstance." Morton's Deposition at 83; *see id.* at 110 (explaining Miller's lack of situational awareness allowed male juveniles to sexually assault DB).

As noted above, Morton said the proper response to a medical incident would have been to call a code. *Id.* at 112. But, Morton testified, "I didn't see [Miller] radio. I do understand a nurse was present. So I think there were alternatives . . . ." *Id.* at 114. And, Morton implied Miller could have used his walkie-talkie to summon Bryant or the nurse. *Id.*

Considering this evidence, the Court agrees with the Magistrate Judge "[a] reasonable jury could find . . . Miller acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known, and that his conduct was objectively unreasonable." Report at 16. In other words, a reasonable jury could well conclude Miller was deliberately indifferent to an excessive risk of harm to DB. Therefore, the Court holds Miller is unentitled to summary judgment on Smith's deliberate indifference claim against him.

For all these reasons, the Court will overrule Bracey and Miller's first objection.

**B.     *Whether the Court should defer its decision on qualified immunity***

Bracey and Miller next contend the Magistrate Judge erred in recommending the Court defer its decision on qualified immunity.

Bracey and Miller narrowly define the constitutional right at issue as "whether [they] violated the Fourteenth Amendment when . . . Miller requested . . . Bracey open the door so he could respond to . . . Carter's apparent medical emergency." Bracey & Miller's Objections at 7. They assert this right is unclearly established, thus entitling them to qualified immunity.

Smith, on the other hand, defines the constitutional right as whether a JCO who "knows or should know there is a substantial risk of harm ha[s] a duty to take reasonable steps to prevent that harm." Smith's Reply at 8. Smith insists this right is clearly established, but she notes whether Bracey and Miller "were actually aware or should have been aware of the substantial risk of harm

11

is a question of fact for the jury to resolve." *Id.* In any event, Smith argues qualified immunity is inapplicable.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "This standard leads to two questions: (1) whether any right was violated, (2) whether that right was 'clearly established' at the time of the alleged violation." *Somers v. Devine*, No. 24-1511, 2025 WL 889762, at *4 (4th Cir. Mar. 24, 2025).

The Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). And, qualified immunity "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted)). Indeed, the Fourth Circuit recently recognized "[s]ummary judgment is often appropriate in the context of qualified immunity[,]" *Somers*, 2025 WL 889762, at *4, where the evidence must be viewed in the light most favorable to the non-moving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court will therefore sustain Bracey and Miller's second objection and proceed to consider whether they are entitled to qualified immunity.

"The first step in assessing if a right is clearly established is defining the right at issue." *King v. Riley*, 76 F.4th 259, 266 (4th Cir. 2023). The Court must "examine the alleged right at a 'high level of particularity.'" *Somers*, 2025 WL 889762, at *5 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999)). "But, by the same token, a rejection of excessive generality does not equate to an insistence on exactitude. Few situations are exactly the same and to require that plaintiffs produce identical precedent would transform qualified immunity into a grant of absolute immunity for defendants." *Id.* (emphasis omitted).

Here, the Court determines Smith properly defined the right at issue as whether a JCO who "knows or should know there is a substantial risk of harm ha[s] a duty to take reasonable steps to prevent that harm." Smith's Reply at 8. The Court further concludes this right is clearly established, as "[t]he Supreme Court . . . ha[s] repeatedly and unequivocally established an inmate's . . . right to be protected from substantial risks of sexual assault by fellow prisoners." *Howard v. Waide*, 534 F.3d 1227, 1242 (10th Cir. 2008); *see, e.g., Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) (collecting cases).

It is true a genuine issue of material fact exists as to whether Bracey and Miller acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. Stated differently, there is a valid question as to whether they were deliberately indifferent to an excessive risk of harm to DB.

And, assuming Bracey and Miller violated DB's constitutional rights, the Court is convinced the facts construed in the light most favorable to Smith indicate this right is clearly established. Accordingly, the Court holds Bracey and Miller are unentitled to qualified immunity.

## V. CONCLUSION

After a thorough review of the Report and the record in this case under the standards set forth above, the Court overrules Bracey and Miller's first objection, sustains their second objection, and adopts the Report to the extent it is consistent with this Order, and incorporates it herein.  It is therefore the judgment of the Court Bracey and Miller's motion for summary judgment is **DENIED**.  Additionally, Okoro, Carter, Bryant, and Suber's motion for summary judgment is **GRANTED**, and Smith's claims against them are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Signed this 31st day of March 2025, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE